

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SK/RCH/EMR/PP/AA                     *271 Cadman Plaza East*
F. #2019R00927                       *Brooklyn, New York 11201*

September 19, 2024

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Genaro Garcia Luna
      <u>Criminal Docket No. 19-576 (S-1) (BMC)</u>

Dear Judge Cogan:

   The government respectfully submits this letter in advance of the sentencing of the defendant Genaro Garcia Luna, which is scheduled for October 9, 2024. The defendant was the chief law enforcement officer of Mexico for over a decade, responsible for overseeing the country's federal police and anti-narcotics efforts. But, as proven at trial, the defendant exploited his power and authority by accepting millions of dollars in bribes from a drug trafficking organization he swore to pursue. In exchange for millions of dollars, the defendant furthered a conspiracy responsible for the deaths of thousands of American and Mexican citizens. It is difficult to overstate the magnitude of the defendant's crimes, the deaths and addiction he facilitated, and his betrayal of the people of Mexico and the United States. His crimes demand justice. For these reasons, and the reasons set forth below, the government respectfully requests that the Court impose a sentence of life imprisonment.

   I.  <u>Background</u>

     A.  <u>Overview</u>

   Between 2001 and 2012, the defendant was a high-ranking official in the Mexican government. <u>See</u> Presentence Investigation Report ("PSR") ¶ 15. Specifically, from 2001 to 2005, the defendant was the head of Mexico's Federal Investigation Agency (known by its Spanish language acronym "AFI"). <u>Id.</u> From 2006 to 2012, the defendant served in a cabinet-level position as Mexico's Secretary of Public Security and, in that capacity, he controlled Mexico's federal police. <u>Id.</u> While holding public office, the defendant used his official positions to assist the Sinaloa Cartel, one of the largest, most violent and most sophisticated drug trafficking organizations in the world (the "Cartel"), in exchange for millions of dollars in bribes. <u>Id.</u>

On February 21, 2023, following a five-week trial, a jury found the defendant guilty of all five counts in the above-referenced superseding indictment.  These counts charged the defendant with:

(i)  engaging in a continuing criminal enterprise ("CCE") (Count One), in violation of Title 21, United States Code, Section 848, and for which the jury found that the government proved all six charged violations against the defendant, PSR ¶¶ 2-8;

(ii)  conspiracy to distribute and possess with intent to distribute cocaine (Count Two), in violation of Title 21, United States Code, Sections 841 and 846;

(iii)  cocaine importation conspiracy (Count Three), in violation of Title 21, United States Code, Sections 952 and 963;

(iv)  international cocaine distribution conspiracy (Count Four), in violation of Title 21, United States Code, Sections 959 and 963; and

(v)  making false statements (Count Five), in violation of Title 18, United States Code, Section 1001, PSR ¶¶ 1-12.

B.  The Defendant Took Millions of Dollars in Bribes from and Assisted the Cartel Carry Out Violence and Distribute Deadly Cocaine

At trial, three high-level Cartel members testified that the defendant accepted millions of dollars in bribes from the Sinaloa Cartel.  PSR ¶¶ 15-16.  The defendant was paid in duffel bags and briefcases; he was paid directly and through intermediaries.  Trial Tr. ("Tr.") 62, 80-81; see also Tr. 1462, 104-106, 491, 515, 538, 1462, 1473-75.  A Cartel accountant also testified that he observed million-dollar payments to the defendant recorded in ledgers.  Tr. 746-747.  As the defendant's corruption allowed the Cartel to flourish, so did its profits, and therefore, its bribes.  Tr. 150-51 (explaining how the defendant earned more money as the Secretary of Public Security because the Cartel had expanded greatly all over Mexico, resulting in bigger loads and bigger profits).

Bribes purchased an essential ally and member of the Cartel.  In exchange for millions of dollars, the defendant provided active assistance, including intelligence about investigations against the Cartel, information about rival cartels, and safe passage of massive quantities of drugs.  PSR ¶¶ 15-17; Tr. 52, 59, 60, 63, 65-66, 514, 1465, 1485.  The Cartel also received federal police uniforms, federal police badges, cars bearing federal police insignia, and protection in the form of police bodyguards.  PSR ¶ 16.

Explaining how valuable the defendant's assistance was, one senior Cartel member testified that payments to the defendant allowed Cartel members to "go around freely … set up and take down checkpoints however we wanted to, whenever we wanted to."  Tr. 100.  And if there were planned raids or police operations, the defendant's federal police notified the Cartel in advance, allowing them to "empty the houses or the warehouses" of contraband.  Id.  Indeed, a U.S. government official recounted that the defendant's federal police did not carry out significant operations against the Cartel, even as it conducted raids against the Cartel's rivals.  PSR ¶ 16; Tr. 1230.  The bribes also ensured that the defendant sabotaged legitimate police operations against

2

the Cartel.  As U.S. law enforcement testified at trial, Mexican federal police hindered efforts to apprehend Cartel leaders.  PSR ¶ 16; Tr. 978, 986-87, 1337-1344.

In a time of intense bloodshed, the defendant took the Cartel's side in its wars with rivals.  As one senior Cartel member vividly recounted at trial, AFI officers formed a perimeter around a ranch where members of a rival cartel were located and allowed Cartel members, wearing AFI uniforms, to murder its rivals.  PSR ¶ 16; Tr. 79-80, 89-90.  Senior Cartel leadership spoke with the defendant about these operations.  Tr. 90.

As a result of the defendant's assistance to the Cartel, thousands of Americans and Mexicans died.  During the time the defendant was in power, approximately 62,000 Americans died from overdoses involving cocaine.[1]  Likewise, cartel-related violence engulfed Mexico during the defendant's tenure, rising to approximately 60,000 killings between 2006 and 2012.[2]

C.    With the Defendant's Assistance, the Sinaloa Cartel Moved Millions of Kilograms of Cocaine

The Cartel relied on its relationship with the defendant to move massive quantities of cocaine—more than one million kilograms—through Mexico and into the United States.  PSR ¶ 17; Tr. 261-262, 863-864.  The Cartel used planes, trains, trucks, and submarines to transport cocaine from Colombia to Mexico to the United States.  PSR ¶ 17; Tr. 1454 (drugs brought in through Mexico City airport); Tr. 262 (drugs smuggled into the United States via train); Tr. 848 (drugs transported from Colombia to Mexico via submarine).  As a senior Cartel leader testified, the Cartel could not have successfully shipped these drugs into the United States without the assistance and protection of the defendant and other co-conspirators within the Mexican government.  Tr. 65.

D.    The Defendant Lied on His Naturalization Application

As charged in Count Five of the Superseding Indictment and proven at trial, the defendant also lied to the U.S. government as part of his naturalization application.  Specifically, in 2018, the defendant swore on naturalization paperwork that he had never committed a crime. PSR ¶ 18; Gov. Trial Ex. 102.  But as the jury found, the defendant was engaged in a criminal enterprise for over a decade, conspiring with the Sinaloa Cartel to import massive quantities of drugs into the United States.

---

[1] Drug Overdose Deaths: Facts and Figures, *National Institutes on Drug Abuse,* https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates

[2] Ross & Shirk, Drug Violence in Mexico: Data and Analysis Through 2012, at p. 15, *Justice in Mexico Project at the Univ. of San Diego* (Feb. 2013), https://justiceinmexico.org/wp-content/uploads/2014/09/2013_DVM.pdf

E.    The Defendant's Corrupt Scheme to Pay for False Testimony

Undeterred by his trial conviction, the defendant plotted to undo the verdict through more corruption and deceit.  The defense filed a motion seeking a new trial claiming that two government witnesses, Oscar Nava Valencia and Edgar Veytia, communicated via contraband cellular telephones in advance of the trial, citing an affidavit from another inmate at the Metropolitan Detention Center ("MDC").  PSR ¶ 20.  The government's investigation revealed that not only were the allegations in the affidavit false, but also that the defendant schemed to obstruct justice and suborn perjury by seeking to bribe or corruptly convince multiple inmates at the MDC to attest to these same false allegations.  Id.

Specifically, Juan Carlos Nava Valencia told the government about the defendant's efforts to persuade MDC inmates to fabricate false accusations that align with the claims in the affidavit submitted by the defendant.  Id.  Multiple other inmates at the MDC corroborated these assertions, detailing the defendant's attempts to coerce false testimony implicating the Nava Valencia brothers and Veytia.  Id.  One such inmate supplied recorded conversations and contemporaneous notes to the government of his meetings with the defendant, which reveal explicit instructions from the defendant to others to concoct false allegations.  Id.  The defendant offered to pay this inmate millions of dollars in exchange for false testimony.  Id.

As the Court concluded in denying the defendant's new trial motion, the defendant engaged in "unsuccessful efforts to bribe inmates at the [MDC] after his trial to create false evidence."  Mem. 1, ECF No. 264.  After summarizing the government's investigation, the Court found "a clear scheme by [the] defendant to obstruct justice through bribery[.]"  Id. at 4; id. at 5 ("The obstruction effort is clear.").  The Court based its findings among other things on witness statements, contemporaneous notes, and a recording, which were "as damning as they could be." Id. at 4-5.

II.    The Guidelines Calculation in the PSR Is Correct

The government agrees with the Guidelines calculation as set forth in the PSR:

Counts Two Through Four: Drug Distribution/Importation Conspiracy

| | | |
|---|---|---|
| Base Offense Level (§§ 2D1.5(a)(5) & (c)(1)) | | 38 |
| Plus: | Dangerous Weapon Possessed (§ 2D1.1(b)(1)) | +2 |
| Plus: | Pattern of Criminal Conduct as Livelihood (§ 2D1.1(b)(16)) | +2 |
| Plus: | Abuse of Position of Trust (§ 3B1.3) | +2 |
| Plus: | Leadership Enhancement (§ 3B1.1(b)) | +3 |
| Plus: | Obstruction of Justice (§ 3C1.1) | +2 |
| Total: | | 49 |

4

Count One: Continuing Criminal Enterprise

Base Offense Level (§ 2D1.5)                                                         46

Plus:       Obstruction of Justice (§ 3C1.1)                                         +2

Total:                                                                              <u>48</u>

Count Five: False Statement

Base Offense Level (§ 2B1.1)                                                          6

Total:                                                                               <u>6</u>

The total offense level, accounting for grouping and multiple account adjustments, is 49, which is treated as a total offense level 43.  PSR ¶¶ 23, 45-47, 51.  The defendant falls within Criminal History Category I.  PSR ¶ 54.  Accordingly, the Guidelines term of incarceration is life imprisonment.  PSR ¶ 86.

The defendant objects to the offense level computation and several enhancements in the Guidelines as calculated by the Probation Department.  ECF No. 260.  The government incorporates by reference its responses to the defense objections.  ECF No. 262.  The Probation Department disagreed with the defense objections and maintained its calculation in its Addendum dated June 7, 2024.  The government respectfully submits that the Guidelines calculation, including the Guidelines term of imprisonment of life, is correct for the reasons previously stated in its prior submission.

III.       <u>Applicable Law</u>

The standards governing sentencing are well-established.  In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  <u>Id.</u> at 264; <u>see also</u> <u>United States v. Kimbrough</u>, 552 U.S. 85 (2007).

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  <u>Booker</u>, 543 U.S. at 252; <u>see also</u> <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that <u>Booker</u>/<u>Fanfan</u> and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.  <u>Molina-Martinez v. United States</u>, 136 S. Ct. 1338, 1345-46 (2016) (internal quotation marks omitted).

5

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. See Crosby, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112; see also United States v. Corsey, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. See Crosby, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

IV.    The Court Should Impose a Guidelines Sentence of Life Imprisonment

A.    The Nature and Circumstances of the Offenses

The defendant stands convicted of abusing the power and authority entrusted to him as Mexico's chief law enforcement official to assist the Sinaloa Cartel at the highest levels. The seriousness of the instant offense cannot be overstated and supports a sentence of life imprisonment. See 18 U.S.C. § 3553(a)(1). The defendant, as head of AFI and then as a member of Mexico's presidential cabinet, was the most powerful law enforcement official in Mexico, with control over Mexico's federal police, as well as its ports and highways. Although he swore an oath to protect the Mexican people from the scourge of addiction and violence caused by the drug cartels, he was instead a double agent secretly acting to further the Cartel's interests. The defendant personally provided intelligence to the Cartel, Tr. 531, plotted to return seized cocaine worth a billion dollars to the Cartel, Tr. 527, 1785-88, and sanctioned the Cartel's violent operations, Tr. 90. He did all this while knowing that thousands of Americans and Mexicans were dying from drug overdoses and cartel-related violence, and he bears responsibility for those deaths.

The federal police working under the defendant also gave safe passage to drug operations in Mexico, provided police equipment and insignia, and even protected Cartel members when they murdered their rivals. Tr. 100. The defendant committed these egregious acts while

6

outwardly branding himself as the enemy of drug cartels and the ally of the United States. In truth, the defendant shielded the very traffickers he had committed to bring to justice.

The defendant's actions allowed the Sinaloa Cartel to thrive and operate with free rein in Mexico. As one senior Cartel member testified, it permitted the Cartel "go around freely … set up and take down checkpoints however we wanted to, whenever we wanted to." Tr. 100. The defendant's corrupt actions allowed the Cartel to import billions of dollars of drugs into the United States and carry out immeasurable violence throughout Mexico.

And the fact that the defendant did not personally handle drugs or pull a trigger is not a mitigating factor but an aggravating one. The defendant ensured his hands were clean—all while serving as the Cartel's key asset. Ensconced in the comfort of his police detail, the defendant allowed the Cartel to flourish—as well as the addiction and violence flowing from its operations. The defendant should not receive a lighter sentence than less significant members of the Cartel and other corrupt officers who carried out his orders.

The trial testimony also showed that the defendant's conduct was not aberrational, further emphasizing the serious nature of his crimes. The defendant did not make a fleeting mistake by accepting a bribe to provide intelligence to a drug Cartel on one or two occasions. To the contrary, the defendant was a trusted and critical member of the Cartel for more than a decade.

Day after day, the defendant lied to and betrayed his fellow officials, American law enforcement, and the Mexican public. The defendant lied when he said he was fighting the drug cartels, despite serving as their critical ally. The defendant lied again when he immigrated to the United States, fraudulently concealing his criminal conduct. And, undeterred by his conviction, the defendant also lied to this Court when he submitted a motion for a new trial based on a perjurious affidavit that was the product of the defendant's corrupt scheme to obstruct justice.

B.    History and Characteristics of the Defendant

The history and characteristics of the defendant also weigh in favor of a sentence of life imprisonment. Although many defendants come before this Court with compelling mitigating factors from difficult upbringings, Garcia Luna is not among them. He has enjoyed a remarkable life. Indeed, unlike some members of drug trafficking conspiracies who are often recruited in Mexico under difficult personal and financial situations, the defendant committed this offense for financial gain despite enjoying a stable upbringing in Mexico, receiving a college degree, and rising to the top of Mexican society as a member of its presidential cabinet. PSR ¶¶ 61, 15. Simply put, the defendant chose greed and corruption over the well-being of the citizens of Mexico and the United States.

Not only has the defendant shown no remorse for his criminal conduct, but he has also continued to commit additional crimes and obstruct justice while in custody. Even after he was convicted, the defendant engaged in "a clear scheme … to obstruct justice through bribery[.]" Mem. 4. The defendant's actions, both in Mexico and while detained in the United States, reflect his contempt for the law. A sentence of life imprisonment is the only one that will provide just

7

punishment to the defendant—for his service to the Cartel and his efforts to corrupt both the immigration and judicial proceedings against him.

        C.     <u>The Need to Promote Respect for the Law and to Afford Adequate Deterrence</u>

A sentence of life imprisonment will also send a critically needed signal that there are serious consequences for accepting bribes from and providing assistance to the cartels. As such, general deterrence for this serious conduct is wholly warranted. <u>See</u> 18 U.S.C. § 3553(b)(2)(B). Such a sentence will further demonstrate that the United States remains committed to preventing drug cartels from sending massive quantities of drugs into the United States. A sentence of life imprisonment will also protect our community. Despite his trial conviction, the defendant has continued to commit crimes while incarcerated, seeking to undo his conviction by paying inmates for false testimony. PSR ¶ 20. This additional act of obstruction calls for accountability.

        D.     <u>Avoiding Unwarranted Sentencing Disparities</u>

A sentence of life imprisonment is also commensurate with sentences for other corrupt officials working with drug cartels. The former president of Honduras Juan Orlando Hernandez (55 years old at the time of his sentencing) was sentenced to 45 years' imprisonment—effectively life imprisonment—and an $8 million fine. Like Garcia Luna, Hernandez participated in a conspiracy to import cocaine into the United States when he accepted millions of dollars of bribes to aid drug traffickers in Honduras. <u>See</u> Judgment, ECF No. 809, <u>United States v. Juan Orlando Hernandez</u>, No. 15-cr-00379-PKC (S.D.N.Y. June 28, 2024). Similarly, Juan Orlando Hernandez's brother and former Honduran Congressman Tony Hernandez received a sentence of life imprisonment for his role in the same drug and government corruption conspiracy. <u>See</u> Judgment, ECF No. 287, <u>United States v. Juan Antonio Hernandez</u>, No. 15-cr-00379-PKC (S.D.N.Y. March 31, 2021).

        E.     <u>The Court Should Impose a Significant Fine of at Least $5 Million</u>

In addition to a term of life imprisonment, the Court should impose a substantial fine of at least $5 million. As discussed above, the Cartel paid bribes to the defendant worth millions of dollars. Tr. 62, 80-81. The defendant also continued to have access to the wealth amassed from his corrupt time in office. As recent as last year, the defendant offered an inmate at the MDC millions of dollars in exchange for false testimony. PSR ¶ 20. Moreover, as the PSR notes, since the defendant has not demonstrated an inability to pay a fine, the Court "shall impose a fine." U.S.S.G. § 5E1.2(a); PSR ¶ 81. Under the relevant statutes of conviction, the defendant can be fined up to $32,250,000. <u>See</u> PSR ¶¶ 100-103.

V.    Conclusion

For those reasons, and the reasons set forth above, the government respectfully requests that the Court impose a sentence of life imprisonment and a substantial fine.

Respectfully submitted,

BREON PEACE
United States Attorney

By:        /s/
Saritha Komatireddy
Ryan C. Harris
Erin M. Reid
Philip Pilmar
Adam Amir
Assistant U.S. Attorneys
(718) 254-7000

cc:    Probation Officer Gregory Giblin (by ECF)
Counsel of Record (by ECF)